IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CURTIS SELZ, BRANDON PACK, AND JENNIFER DAVIS, Individually and on Behalf of Others Similarly Situated,<br><br>        Plaintiffs, | <br><br>MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| INVESTOOLS, INC., a corporation,<br><br>        Defendant. | Case No. 2:09-CV-1042 TS |

## I. INTRODUCTION

This matter is before the Court on Defendant's Second Motion for Summary Judgment[1]

and Defendant's Motion to Strike Declaration of Jesse Brar.[2] Plaintiffs Brandon Pack and

Jennifer Davis are former employees of Investools, Inc. ("Investools") and allege that Investools

---

[1]Docket No. 38.

[2]Docket No. 68.

violated the Fair Labor Standards Act ("FLSA") by failing to pay them overtime wages.[3]

Investools seeks summary judgment on the basis that it was exempt from the overtime wage requirements of the FLSA because Plaintiffs' employment fell under the commissioned sales exemption. For the reasons discussed below, the Court will grant the Motion in regards to the "retail establishment" requirement of FLSA exemption, but will deny the Motion in regards to the minimum wage requirement because there is a clear dispute of material fact that should be left to a jury.

## II. BACKGROUND

Investools markets products and services which educate individuals on how to personally invest in exchange markets online and aid them in doing so. Plaintiffs were employed as Sales Representatives in a call center in Draper, Utah. As such, they made and received telephone calls and sold various Investools products over the telephone to consumers. Sales Representatives are not licensed brokers, analysts, counselors, financial advisors, or consultants—they merely sell Investools products and services. As Sales Representatives, Plaintiffs were compensated solely in commissions.[4] Investools creates the materials sold by the Sales Representatives in the same building the sales representatives work out of, but the Sales Representatives work in the Call Center, which occupies its own floor and the employees generally do not work with other departments within the company.

---

[3]The Court previously granted summary judgment in favor of Defendant in regards to claims brought by Plaintiff Curtis Selz. Docket No. 44.

[4]Plaintiff Brandon Pack received other compensation while employed in another department, but only received commissions while employed as a Sales Representative.

The parties agree that Plaintiffs, on average, worked more than forty hours per week. However, it is not clear how many hours per week Plaintiffs worked. Plaintiffs claim that they were told by management to only report forty-hour workweeks on their time cards, and Plaintiff's counsel has provided tables showing estimated workweeks based on when Plaintiffs made/received their first and last telephone calls of the day. Investools challenges the telephone logs as an accurate measure of hours worked because they do not reflect whether Plaintiffs were at work and working continually between their first and last telephone calls and Sales Representatives have considerable flexibility in setting their schedule and taking breaks. Based on Plaintiffs' table, Pack's commission compensation failed to meet the 150% of minimum wage requirement of the FLSA in two of the thirty-seven listed two-week pay periods in 2007 and 2008.[5] Davis did not submit evidence regarding her wages for specific pay periods because she did not have records showing her wages from any specific two-week pay period.[6] Pack's gross wages were $102,323.06 in 2007 and $74,878.50 in 2008.[7] Davis's gross wages were $79,144.00 in 2007 and $40,486.29 in the fifteen two-week pay periods she worked in 2008.

---

[5]Docket No. 65-8, Ex. 1. However, one of these pay periods lists two paychecks for the pay period. If the hours and total amount paid are added from these two checks, the amount would exceed 150% of the minimum wage.

[6]Docket No. 65-9.

[7]Docket No. 38, Exs. A-C.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[8]  In considering whether a genuine issue of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[9]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[10]  Both movants and nonmovants of summary judgment motions must support their assertions by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[11]

### IV. GENERAL FLSA STANDARDS

"The FLSA was enacted to eliminate 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers' and to ensure that employees are fairly compensated."[12]  It generally requires that employees be compensated at one and a half times their regular wages for hours worked in

---

[8]FED. R. CIV. P. 56(a).

[9]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[10]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[11]FED. R. CIV. P. 56(c)(1).

[12]*Schwind v. EW & Assocs, Inc.*, 371 F. Supp. 2d 560, 562 (S.D.N.Y. 2005) (quoting 29 U.S.C. § 202(a); citing *Reich v. New York City Transit Auth.*, 45 F.3d 646 (2d Cir. 1995)).

4

excess of forty hours per week. "The FLSA, however, specifically provides for exemptions that exclude certain employees from the FLSA's overtime provisions. These exemptions are defined by the Department of Labor ('DOL') regulations and '[e]mployees whose jobs fall within one of the enumerated categories are not entitled to certain protections of the Act [FLSA] . . . . Employers need not pay exempt employees overtime no matter how many hours they work each week.'"[13]

"The employer has the burden of proof to establish that the subject employee falls under any of the enumerated exemptions."[14] "Because the FLSA is a remedial statute, 'its exemptions are construed narrowly against the employer.'"[15] However, both the Seventh and Eighth Circuits have established that the narrow interpretation requirement regarding the FLSA is not strictly enforced and only serves as a tie-breaker.[16]

The exemption at issue in this matter is the § 7(i) exemption, which states:

(i) Employment by retail or service establishment

No employer shall be deemed to have violated subsection (a) of this section [requiring time and a half compensation for a workweek beyond forty hours] by

---

[13]*Id.* at 262-63 (alterations in original) (quoting *Wright v. AARGO Sec. Servs., Inc.*, 2001 WL 91705, at *2 (S.D.N.Y. Feb. 2, 2001)).

[14]*Id.* at 263 (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Wright*, 2001 WL 91705, at *2).

[15]*Id.* (quoting *Wright*, 2001 WL 91705, at *2); *see also Shultz v. Adair's Cafeterias, Inc.*, 420 F.2d 390, 393 (10th Cir. 1969).

[16]*Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 508 (7th Cir. 2007) ("[T]he principle of narrow interpretation of exemptions is a tie-breaker." (citing *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1177-78 (7th Cir. 1987)); *Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1186 (8th Cir. 1993)).

employing any employee of a retail or service establishment . . . , if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. . . .[17]

The parties do not dispute that more than half of Plaintiffs' wages came from commissions. Thus, to prevail in its Motion, Investools must show that it is a retail establishment and that Plaintiffs' regular rate of pay was in excess of 150% of the minimum wage.

## V. RETAIL ESTABLISHMENT

A.    DEFERENCE

In order to qualify for the § 7(i) exemption, Defendant must show that it is a "retail or service establishment."[18] The determination of whether Defendant's business is a retail or service establishment is a matter of statutory construction and is thus a question of law to be determined by the Court.[19] Section 207(i) does not define "retail or service establishment." Rather, the term "is to be interpreted as defined in the now repealed § 13(a) of the FLSA,"[20] which defines it as "an establishment 75 per centum of whose annual dollar volume of sales of

---

[17]29 U.S.C. § 207(I).

[18]*Reich*, 3 F.3d at 1183; *see Yi*, 480 F.3d at 507.

[19]*See Schoenhals v. Cockrum*, 647 F.2d 1080, 1081 (10th Cir. 1981) ("The initial inquiry in determining if this exemption applies to an establishment is whether the industry itself is one which Congress contemplated as falling within the 'retail concept' of the Act. This question is a legal issue of statutory construction." (quotations omitted)).

[20]*La Parne v. Monex Deposit Co.*, 714 F. Supp. 2d 1035, 1039 (C.D. Cal. 2010) (citing 29 C.F.R. § 779.312; *Gieg v. DDR, Inc.*, 407 F.3d 1038 (9th Cir. 2005); *Martin v. Refrigeration School, Inc.*, 968 F.2d 3, 5 (9th Cir. 1992)).

goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry."[21] The Department of Labor has issued lengthy interpretive regulations to further define a "retail or service establishment."[22]

In determining how much deference the courts should give to regulations promulgated by federal agencies, there are two principal lines of cases. Under the more deferential line, court apply what has been termed "*Cheveron* deference."[23] In applying *Chevron* deference, courts "*must* give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute."[24] Chevron deference "is warranted if 'Congress delegated authority to the agency generally to make rules carrying the force of law' and the agency's interpretation of the statute was issued pursuant to that authority."[25] Congressional delegation "may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.'"[26]

The less deferential line of deference is referred to as *Skidmore* deference. In applying *Skidmore* deference, courts will consider a regulation's persuasive authority insofar as it is

---

[21]29 C.F.R. § 779.312 (2010).

[22]*See* 29 C.F.R. §§ 779.313 through 779.321, and 779.339 through 779.341.

[23]The term originates from the case *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[24]*Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (citing *Chevron*, 467 U.S. at 842-44 (1984)) (emphasis added).

[25]*Carpio v. Holder*, 592 F.3d 1091, 1096 (10th Cir. 2010) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).

[26]*Id.* (quoting *Mead*, 533 U.S. at 226-27).

persuasive; the regulation will not carry the force of law.[27] "With *Skidmore* deference, the weight to be given the agency's practice in particular circumstances depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . .'"[28]

When considering the "retail or service establishment" requirement of § (7)(i), courts have varied in applying *Chevron* or *Skidmore* deference to the DOL regulations.[29] The Court must determine the level of deference the DOL regulations deserve because the parties disagree on the matter and the Court's decision turns on whether to strictly enforce the regulation's requirement that a retail or service establishment be "local."[30] The Tenth Circuit has not determined this issue, and the Court finds convincing the analysis in *English v. Ecolab, Inc.*,[31]

---

[27]*English*, 2008 WL 878456, at *7; *see also Fowler v. Incor*, 279 Fed. Appx. 590, 598 (10th Cir. 2008) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 138 (1944) ("[Under *Skidmore* deference] courts should defer to [an agency's statutory interpretations] only to the extent they have the power to persuade.")

[28]*McGraw v. Barnhart*, 450 F.3d 493, 501 (10th Cir. 2006) (quoting *Skidmore*, 323 U.S. at 140).

[29]*Compare*, *Martin*, 968 F.3d at 6 (Ninth Circuit applying *Chevron* deference), *and Schwind v. EW & Assocs, Inc.*, 371 F. Supp. 2d 560, 564-65 (S.D.N.Y. 2005) (not discussing the level of deference, but stating the DOL regulations as the governing rule), *and Liger v. New Orleans Hornets NBA Ltd. P'ship*, 565 F. Supp. 2d 680, 687 n.8 (E.D. La. 2008) (stating that the 5th Circuit rule is to apply *Chevron* deference to DOL interpretations of the FLSA), *with Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1186 (8th Cir. 1993) (Eighth Circuit applying *Skidmore* deference and not following the position consistently taken by the DOL in published regulations and opinion letters), *and English*, 2008 WL 878456, at 5-7 (discussing whether to apply *Chevron* or *Skidmore* deference and concluding that *Skidmore* deference is appropriate).

[30]29 C.F.R. § 779.315.

[31]2008 WL 878456.

which applied *Skidmore* deference because (1) the regulations state that *Skidmore* deference is appropriate at 29 C.F.R. § 779.9 (2010), (2) the regulations were not subject to notice-and-comment rulemaking, and (3) the text of the statute did not expressly delegate rulemaking authority to the DOL.[32] This conclusion is in line with the Tenth Circuit's statement that the DOL regulations "provide substantial *guidance* on the issue of what constitutes a retail service establishment."[33]

Applying *Skidmore* deference, the Court finds the persuasive value of the regulations to be minimal. The regulations in large part were not drafted for § 7(i) but for the now repealed § 13(a). Because § 13(a) has been repealed, the regulations have not been updated to reflect the impact of the Internet on retail and service industries. Today, nearly every retail establishment offers its products for sale via the Internet. Additionally, the Internet has made it possible for small start-up companies to market their products and services at a minimal cost and to a broader group than was previously possible. In sum, the Internet has fundamentally changed what is considered a "retail or service establishment," and insofar as the DOL regulations do not take this into account they are not a persuasive interpretation of the FLSA. The Court also finds

---

[32]*Id.* at *6-7. The Court notes Congress did expressly delegate rulemaking authority for other provisions of the FLSA, but did not do so regarding the definition of "retail or service establishment." *See Clements v. Serco, Inc.*, 530 F.3d 1224, 1226-27 (10th Cir. 2008) (noting that Congress delegated authority for the Secretary of Labor to define the "outside salesmen" exemption (citing 29 U.S.C. § 213(a)(1))).

[33]*Schoenhals v. Cockrum*, 647 F.2d 1080, 1081 (10th Cir. 1981) (emphasis added).

9

persuasive the analysis of the *English* court which also found that the "local" requirement is not applicable in § 7(i) cases.[34]

B.     FACTORS TO BE CONSIDERED

In determining which factors to consider in determining whether Investools qualifies for the § 7(i) exemption, the Court will analyze the factors raised by the parties.  The regulations provide several factors that courts consider in determining whether a business qualifies as a "retail or service establishment."  Section 7(i) cases addressing this issue do not analyze a uniform set of factors, nor do they follow any specific order.  Also, there is no governing Tenth Circuit law on point.  The factors come in large part from 29 C.F.R. § 779.318(a), which provides typical characteristics and examples of retail or service establishments.  Namely, such an establishment "sells goods or services to the general public," "serves the everyday needs of the community in which it is located," disposes its products in small quantities, is at the "very end of the stream of distribution," and "does not take part in the manufacturing process."

Investools argues that it is a retail establishment because (1) its call center sells products directly to the public, (2) the products are not for resell, and (3) the call center meets the needs of the community.  Plaintiffs argue that Investools is not a retail establishment because (1) Investools is not a traditional retail establishment because it produces the products it sells to the public, (2) Investools is not a local establishment because it sells a majority of its products to

_____

[34]*English*, 2008 WL 878456, at *3-4; *see also La Parne*, 714 F. Supp. 2d at 1045 (agreeing with the analysis from *English*, and concluding that a California-based business that sold precious metals nationwide was a "retail or service establishment").

individuals residing outside of Utah, and (3) Investools is not recognized as a retail establishment in the particular industry.

## C.    "RETAIL CONCEPT" AND "RECOGNIZED AS RETAIL WITHIN THE INDUSTRY"

The regulations state that the threshold question in determining whether a business is a "retail or service establishment" is whether the industry lacks a "retail concept."[35]

The regulations also provide guidance as to when an enterprise is "recognized as retail sales or services in the particular industry."

> In order to determine whether a sale or service is recognized as a retail sale or service in the "particular industry" it is necessary to identify the "particular" industry to which the sale or service belongs. Some situations are clear and present no difficulty. The sale of clothes, for example, belongs to the clothing industry and the sale of ice belongs to the ice industry. In other situations, a sale or service is not so easily earmarked and a wide area of overlapping exists. Household appliances are sold by public utilities as well as by department stores and by stores specializing in the sale of such goods; and tires are sold by manufacturers' outlets, by independent tire dealers and by other types of outlets. In these cases, a fair determination as to whether a sale or service is recognized as retail in the "particular" industry may be made by giving to the term "industry" its broad statutory definition as a "group of industries" and thus including all industries wherein a significant quantity of the particular product or service is sold. For example, in determining whether a sale of lumber is a retail sale, it is the recognition the sale of lumber occupies in the lumber industry generally which decides its character rather than the recognition such sales occupies in any branch of that industry.[36]

> The express terms of the statutory provision requires the "recognition" to be "in" the industry and not "by" the industry. Thus, the basis for the determination as to what is recognized as retail "in the particular industry" is wider and greater than the views of an employer in a trade or business, or an association of such employers. . . . Such a determination must take into consideration the well-settled

---

[35]*Id.* § 779.316 (2010).

[36]*Id.* § 779.323.

habits of business, traditional understanding and common knowledge. These involve the understanding and knowledge of the purchaser as well as the seller, the wholesaler as well as the retailer, the employee as well as the employer, and private and governmental research and statistical organizations. The understanding of all these and others who have knowledge of recognized classifications in an industry, would all be relevant in the determination of the question.[37]

In the cases cited by the parties that deal with call-center type employers, the courts consistently identified the industry at issue. In *La Parne v. Monex Deposit Company*,[38] the court had to determine whether a company that sold precious metals nationwide for investment and collection purposes was a "retail or service establishment." The Court held that the defendant belonged to the precious metal industry and that the industry had a retail concept.[39] In *Underwood v. NMC Mortgage Corporation*[40] and *Barnett v. Washington Mutual Bank*[41] the courts held that mortgage loan brokerage companies, which advertised widely and found mortgage lenders for potential borrowers, were members of the financial industry[42] and credit[43] industry respectively. Both industries lack a retail concept according to a list in the regulations.[44]

---

[37]*Id.* § 779.324.

[38]*La Parne*, 714 F. Supp. 2d 1035.

[39]*Id.* at 1041.

[40]2009 WL 1269465 (D. Kan. May 6, 2009).

[41]2004 WL 1753400 (N.D. Cal. Aug. 5, 2004).

[42]*Underwood*, 2009 WL 1269465, at *5.

[43]*Barnett*, 2004 WL 1753400, at *6.

[44]29 C.F.R. § 779.317 (including credit companies and finance companies in the "Partial list of establishments lacking "retail concept.").

The Court notes that according to the regulations, educational institutions, finance companies, and investment counseling firms all lack a retail concept.[45] Thus, if Investools falls within one of these categories the regulations recommend that the § 7(i) exemption not apply. Investools, as a marketer of materials that teach and aid individuals to do their own financial investing, does not fit into the traditional concept of an educational institution, such as a for-profit university; a finance company, such as a bank; or an investment counseling firm. Consequently, the Court finds that marketing tools to aid individuals in independently investing personal funds is its own industry. Furthermore, the Court finds that this industry, which relies on selling its products directly to individual purchasers who will use the product, has a retail concept.

Plaintiffs argue that Defendant has failed to carry its burden of proof regarding the requirement that it be recognized in the industry as a retail establishment. The cases often discuss this requirement in conjunction with the "retail concept" question. In *Idaho Sheet Metal Works, Inc.*, the U.S. Supreme Court rejected the exclusive use of an industry usage test to make this determination.[46] The Court emphasized flexibility in making this determination and chose not to lay out a specific test or list of requirements.[47] However, one key consideration is whether the goods or services are acquired for personal use.[48] The Court finds that because Investools

---

[45]*Id.*

[46]383 U.S. 190 (1966).

[47]*Id.* at 203-05.

[48]*Id.* at 203.

markets educational materials for personal use, its sales are retail sales and satisfy the "retail concept" and "recognized as retail in the industry" questions.

D.     SELLS GOODS OR SERVICES TO THE GENERAL PUBLIC

Investools sells its products through a call-center.  It does not have a traditional retail location where the public physically purchases its products.  However, the case law does not require a physical location accessed by the public.  For example, in *La Parne v. Monex*, Monex marketed precious metals through television and newspaper advertising, its website, brochures, and customer referrals.[49]  Its sales people primarily made sales over the telephone and sold the metals nationally.  The Court held that Monex satisfied the "sells to the general public" requirement.[50]  In *English v. Ecolab, Inc.*, Plaintiffs were extermination specialists who received calls, which had been re-routed from a national customer service center, and performed their services at clients' businesses or residences.[51]  The court rejected the argument that Ecolab was a wholesaler based on the vast majority of its sales being made to commercial entities and held that it was a retail or service establishment.[52]

Based on the above cited cases and the fact that the parties have not cited a case holding that a call-center failed the "sells to the general public" requirement, the Court finds that Investools does sell goods or services to the general public.

---

[49]714 F. Supp. 2d 1035 at 1037.

[50]*Id.* at 1042-43.

[51]2008 WL 878456, at *1.

[52]*Id.* at *12-13.

E.      SERVES THE EVERYDAY NEEDS OF THE COMMUNITY

As discussed above, recent cases have read the local requirement out of the serves the everyday needs of the community requirement.  The Court, in applying *Skidmore* deference, does likewise.

In *Schwind v. EW & Associates, Inc.*, EWA operated "a training and consulting firm which provide[d] computer training for software programs [such as ACT! and Microsoft Office] and systems to commercial businesses."[53]  EWA only offered its services to businesses.[54]  Still, the court held that EWA "served the everyday needs of the community" because computer training is an essential need in today's world.[55]  In *Viciedo v. New Horizons Computer Learning Center of Columbus, Ltd.*, the defendant ("NHC"), also offered computer training.  It solicited business over the telephone and held trainings at is offices, at customers' offices, and online.[56]  The court held, similar to *Schwind*, that NHC served the everyday needs of the community because "regardless of the level of complexity of the training, in today's world, any type of computer training serves the everyday needs of the community."[57]  In *English*, the court held that extermination services offered nationally and provided to commercial establishments served the

---

[53]371 F. Supp. 2d at 565.

[54]*Id.* at 566.

[55]*Id.*

[56]246 F. Supp. 2d 886, 889 (S.D.N.Y. 2005).

[57]*Id.* at 894.

15

everyday needs of the community.[58]  The *La Parne* court addressed this requirement in depth

and, after considering the case law, held: "While the purchase of precious metals may not

initially sound like a basic need of members of the community, it is when looking to the two

basic purposes for which buyers purchase precious metals—collecting the metals and investing

the metals.  These two purposes are integral uses of the community."[59]

Investools sells its products and services directly to individuals with the purpose of

educating those individuals and aiding them in investing their personal funds.  Investing, as

stated by the *La Parne* court, is a basic need of members of the community in today's world, and

Investools serves that need.  Therefore, the Court finds that Investools' activities satisfies the

serves the needs of the public requirement.

F.      END OF THE STREAM OF DISTRIBUTION

The parties do not dispute that Investools sells products to individuals for individual use

and not for resale.  Thus, it is at the end of the stream of distribution.

G.      DOES NOT TAKE PART IN THE MANUFACTURING PROCESS

Investools, as a company, develops and produces the products that Plaintiffs sold when

employed as sales representatives.  The Product Development Group and Call Center, along with

other divisions within Investools, are located in a single building.  However, they occupy distinct

physical spaces—the Call Center occupies the second floor of the building—and the Call Center

---

[58]2008 WL 878456, at *12-13.

[59]*La Parne v. Monex Deposit Co.*, 714 F. Supp. 2d at 1044 (C.D. Cal. 2010).

is not involved in the development or production of Investools' products.[60] The compensation

process for the Call Center is handled differently than that of other Investools' employees and

separate spreadsheets—the Sales Floor Spreadsheets—are used to calculate compensation for the

Main Sales Floor employees.

The regulations provide significant guidance on determining whether Investools' Call

Center is a separate establishment from the Product and Development Group.

> [T]he term establishment as used in the Act means a distinct physical place of
> business. . . . The term "establishment," however, is not synonymous with the
> words "business" or "enterprise" . . . . For example, a manufacturer may operate a
> plant for production of its goods, a separate warehouse for storage and
> distribution, and several stores from which its products are sold. Each such
> physically separate place of business is a separate establishment.[61]

> Although . . . two or more departments of a business may constitute a single
> establishment, *two or more physically separated portions of a business though
> located on the same premises, and even under the same roof in some
> circumstances may constitute more than one establishment for purposes of
> exemptions.* In order to effect such a result physical separation is a prerequisite. In
> addition, the physically separated portions of the business also must be engaged in
> operations which are functionally separated from each other. . . . In other words,
> the retail portion of an establishment would be considered a separate
> establishment from the unrelated portion for the purpose of the exemption if (a) It
> is physically separated from the other activities; and (b) it is functionally operated
> as a separate unit having separate records, and separate bookkeeping; and (c) there
> is no interchange of employees between the units. The requirement that there be
> no interchange of employees between the units does not mean that an employee of
> one unit may not occasionally, when circumstances require it, render some help in
> the other units or that one employee of one unit may not be transferred to work in
> the other unit. The requirement has reference to the indiscriminate use of the
> employee in both units without regard to the segregated functions of such units.[62]

---

[60]Docket No. 70, Ex. A, at 3.

[61]29 C.F.R. § 779.303.

[62]*Id.* § 779.305 (emphasis added).

According to the regulations, the fact that Investools develops and manufactures its products in the same building it sells them from does not absolutely bar Investools from qualifying for the § 7(i) exemption. The regulations specifically allow for instances where the exemption will apply and provides three requirements for establishments within the same business to be distinct from one another: physical separateness; functional separateness, including separate records and bookkeeping; and limited interchange of employees between the units.

Investools meets the physical requirement by having its Sales Center occupy a separate floor from the other parts of the company. The functional separateness requirement could be read to require absolute separateness of company records, but such a requirement would be impractical for modern businesses where records are stored electronically. Investools has an entirely different compensation system for its Sales Center employees, and their wages are calculated using spreadsheets specific to the Sales Center. This satisfies the functionally separateness requirement. In today's business environment, maintaining different spreadsheets and compensation systems satisfies the "separate records and bookkeeping" requirement in the regulation. The employee requirement is also met. While the evidence shows there may be some interchange between the employees,[63] it is sufficiently limited to satisfy the limited interchange of employees requirement as it is clear there is not an indiscriminate use of Sales Center employees in other areas of Investools.

---

[63]*See* Docket No. 78, Ex. A, at 2.

Plaintiffs cite several cases where courts held the production and retail establishments were not sufficiently separate. However, none of the cases cited provide examples where employees were hired to conduct sales from a physically distinct space and were not employed in the production phase of the business.

In sum, the Court finds that the Investools Sales Center is a distinct establishment from the portions of the business that develop and manufactures Investools' products. It further concludes that Investools is, in fact, a "retail or service establishment."

## VI. MINIMUM WAGE

To qualify for the § 7(i) exemption, Defendant must show that Plaintiffs earned greater than one and a half times the minimum wage. This "is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight-time earnings for such hours to obtain the statutory regular rate."[64] The regulations clearly state that the minimum wage requirement is to be calculated on a weekly basis, and if not satisfied, then the employer loses the exemption for that week.[65] "However, the regulations also provide that '[i]f it is not possible or practicable to allocate the commission among the workweeks of the period in proportion to the amount of commission actually earned or reasonably presumed to be earned each week, some other reasonable and equitable method must be adopted.'"[66]

---

[64]29 C.F.R. § 779.419(b) (citing *Overnight Motor Co. v. Missel*, 316 U.S. 572 (1942)).

[65]*Id.* § 779.419(a).

[66]*Schwind*, 371 F. Supp. 2d at 567-68 (quoting 29 C.F.R. § 778.120).

In *Viciedo v. New Horizons Computer Learning Center of Columbus, Ltd.*, the court rejected the defendant's argument that the plaintiffs' *average* hourly rate was substantially higher than 150% the minimum wage.[67]  It calculated the minimum wage requirement on a week-by-week basis and permitted the case to go forward "with respect to the weeks during which [the plaintiffs] earned less than one and one-half times the minimum wage."[68]

In contrast, in *Schwind v. EW & Associates, Inc.*, the court was not able to form a week-by-week computation of hours worked and wages earned because of the unique circumstances of the employment—where the employee was paid only after the customers paid the defendants—and because the parties had not provided the Court with the specific number of hours worked.[69]  The plaintiff had "only provided a conclusory statement that he 'regularly worked more than 40 hours per week."[70]  Under these circumstances the court concluded that "the most reasonable and equitable method in determining plaintiff's regular rate of pay . . . is to average the commissions received by plaintiff in a given year and allocate the average to each week."[71]  The court cited circuit court authority for the proposition that "'[c]ommission salesman [sic] have fluctuating hours and income, and it is unlikely that Congress meant to require employers to pay overtime in the lean weeks when the fat weeks more than make up.  Other cases

---

[67]*Viciedo*, 246 F. Supp. 2d at 895.

[68]*Id.* at 896.

[69]371 F. Supp. 2d at 567-68.

[70]*Id.* at 568 n.7.

[71]*Id.* at 568.

have used periods as long as a year to establish average wages.'"[72]  The court continued: "Consequently, when plaintiff's average wages are calculated on a yearly basis it is clear that his regular rate of pay was in excess of one and one-half times the minimal hourly rate applicable to him, regardless of how many hours of overtime he alleges to have worked."[73]

*Schwind* is distinguishable from this matter because in *Schwind* it was not possible to establish an hourly rate of pay for any given week due to the delay in commissions being paid out.  No such complication is present here.  The only reason it is unclear whether the minimum wage requirement is met is because the employee time cards are not accurate.

In *Underwood v. NMC Mortgage Corp.*, the District of Kansas court faced a similar issue.[74]  A "factual dispute between the parties [existed] as to the amount of hours Plaintiffs worked" because Plaintiffs claimed they were instructed to never put more than forty hours on their time cards.[75]  The court held that determining the number of hours actually worked would involve credibility determinations and/or weighing of the evidence and, consequently, summary judgment was not warranted.

The Court finds this matter is substantially similar to *Underwood*.  It is unclear how many hours Plaintiffs worked on any given week.  Plaintiffs have submitted telephone logs as evidence

---

[72]*Id.* (citing *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 307 (7th Cir. 1986)).

[73]*Id.*

[74]*Underwood*, 2009 WL 1269465.

[75]*Id.* at *7.

of their hours worked, but analyzing the logs would involve weighing the evidence—which the Court will not do on a motion for summary judgment.

In conclusion, the § (7)(i) exemption is lost for the weeks that an employer fails to compensate its employees at one and half times the minimum wage. The Court must—if possible—make a week-by-week determination of whether the minimum wage requirement is met. Factual questions of the number of hours worked prevent the Court from making the calculation. Thus, the matter must be left to the jury.

## VII.  Motion to Strike

Investools moves to strike the Declaration of Jesse Brar.[76]  Brar is counsel for Plaintiffs, and his declaration uses the phone logs to estimate the hours Plaintiffs worked each week. Determining the validity of Brar's estimates involves a question of fact the Court has ruled is best left for the jury. Thus, the Court will deny the Motion to Strike as moot.

## VIII.  CONCLUSION

The Court finds that Investools is a "retail or service establishment."  However, factual determinations preclude the Court from determining if the minimum wage requirement of § 7(i) is satisfied.  Consequently, the Court cannot make a determination as to whether Investools qualifies for the § 7(i) exemption at this time.  It is hereby

ORDERED that Defendant's Second Motion for Summary Judgment (Docket No. 38) is DENIED.  It is further

---

[76]Docket No. 68.

ORDERED that Defendant's Motion to Strike Declaration of Jesse Brar (Docket No. 68) is DENIED AS MOOT. As per the Court's standard procedure, it will order the parties to participate in a settlement conference in a separate order.

DATED   January 27, 2011.

BY THE COURT:

_____

TED STEWART
United States District Judge